Good morning, Your Honors. Fred Giannetta, Giannetta and Frucht for the Plaintiff and Appellant, Mr. Rey. I'd like to point out, I'm not going to go through all of the issues that are raised in the papers. I want to focus on what I think are questions of material fact, that in reading the trial court's opinion, the narrative would almost appear as though it were written by the defendants, and the disputed facts that were introduced by Mr. Rey were, in our view, largely ignored. I'd like to focus first on the question of Mr. Rey's alleged performance problems. Are we addressing the age claim or the retaliation claim? Both, Your Honor. And I'd like to focus first on the retaliation claim. And I'd point out that, number one, the – Well, I hope you focus on the retaliation claim. Certainly. Because I was a little troubled about the age claim. I didn't know whether he even made a prima facie case. But go ahead. Thank you. If I have enough time, I'll spend a few seconds on the age claim as well. For purposes of retaliation, I want to focus on performance, because that performance was offered by C&H as the business reason for terminating Mr. Rey. We think that this whole performance issue actually turns out to be evidence of pretext. The first point, the first challenge to Mr. Rey's performance, is his initial performance review, which predated the commencement of the employment of Mr. Adams, the main protagonist, as his supervisor. That initial performance review had a needs improvement, but that was a few months after he had started, and the form itself, which C&H now has to be in the awkward position of challenging, says that's a standard designation or standard recognition of performance for somebody who's a new employee. The C&H plant is nearly 100 years old. It's very large. It's very complex. And I think even C&H will acknowledge this. It takes a while for a new employee to learn all the ins and outs of what their job is supposed to be. So that's a standard recognition of performance for a new employee. Mr. White? Are you really arguing the pretext part of this agreement, or part of this determination that you must argue? Are you starting with your prima facie case? Well, I'm starting. I think their pretext is — I think that the defense has met their burden and showed, and then it was your job to go for pretext. Correct. Right? The worry that I have with the retaliation claim on pretext is this. It seemed to me, based on the facts, on March 28th, your client submitted his claim to HR. Submitted, but it wasn't stamped received by HR. It wasn't stamped received until April 8th. Correct. When they received it. And then on April 8th, he was told he was going on a 30, 60, 90-day probation, and they started taking pictures of his area, right? That's the commencement. That's when the floodgates open with that. But the problem that I have there is I'm not sure that we would even have anybody who's talking to him about his 30, 60, 90-day probation, or Adams and Landa even know he submitted any claim. We know that Ms. Cronin dissembled on this point because in the course of her investigation, she claims and testified, I never told Mr. Adams that Mr. Ray had complained, and I took that deposition, and Ms. Cronin indicated that that was in part to protect Mr. Ray from retaliation, that Mr. Adams should not have been told. But, in fact, we know that Mr. Adams did know, and it could only have come from her, that Mr. Ray had made this claim. How do we know that? Because we know that from her notes. The notes of her interview with Mr. Adams indicated that Mr. Adams responded to her, Ray made this point, made this claim about this year-old comment because he's a bad performer and he's trying to protect his job, and she believed it. That's what the record shows. But, I mean, I read those notes, and I've tried to put them in perspective because it seems to me that the best argument that you can't have a pretext, or at least there's no question of fact on pretext, is the people doing what they had to do didn't even know about the claim. And so I saw that your client was put on the probation on April 8th based on the facts. HR didn't even know about anything until April 8th. I saw Adams and Linda start taking pictures of his area right after that. Again, nothing that I can find that they knew about this complaint. And on May 8th, frankly, Adams writes to Cronin and Merritt and complains about poor performance. And so I'm trying to put this in perspective to say how would I know? How would I be able to say there's a question of fact? Look at the proximity. April 8th, prior to April 8th, there is no record, zero record, of any indication to Mr. Ray that he has had any performance problems. His two supervisors, the former plaintiff. Just a minute. His first performance evaluation says he needs improvement. And that's the one that I was referring to a moment ago. That performance evaluation, according to then supervisor Don White, the guy who was there at the time, said we expect that of a new employee. That does not mean he's performing subpar. So that is not indicative of poor performance on the part of Mr. Ray. What about when the hourly employees complained to Landa that he would not or could not help them when a particular problem would arise on his shift? He didn't know what to do to address the problem. That was before. And that was okay. But that comes from Mr. Landa's notes, which supposedly then were documentation. Those notes are for performance evaluations of employees. According to Mr. White and Mr. Fairman, Mr. Landa had notes on lots of other employees, including Mr. White and Mr. Fairman. And yet there is no evidence whatsoever in this record that those notes were used to discipline any employee except Mr. Ray. And the fact that he was singled out and never once saw those notes or any of those claims, there was no counseling memo, there were no counseling sessions, there's no write-ups whatsoever of Mr. Ray in that record up to the point of April 8th. But does it really matter? I mean, the fact is that the note is the note and his non-performance was taken account of? I'm sorry. I couldn't hear you, Your Honor. So the note is pre him being placed on the 30-, 60-, 90-day probation, right? Yes. Okay. The fact that there were notes about other employees, what difference does that make? The fact is that somebody noted that apparently his performance was not what it should be, right? Because, well, I think what's significant about that, number one, is that those notes were never provided to Mr. Ray. There was never any formal documentation. Mr. White. But does that matter? The fact is that someone in a supervisory capacity noted that his performance was not adequate. I think it does matter. And the reason it matters is because Mr. White, the then supervisor, indicated that there is a specific process, sort of a progressive discipline process, in place at CNH where we carefully document what an employee is doing performance-wise, if they're having problems, so that we can give them opportunities to learn and to improve. And did that not happen in April? No. It never happened for 14 or 15 months between the time that he started until April of that year, when Mr. Adams first puts him on the PIP. And I'd like to also point out that performance improvement plan, that so-called 30, 60, 90, is not something the company recognizes. That is not their formal plan. That is something that Mr. Adams made up at the time. So the formal plan was something that came a little bit later in time. So I think it is significant when notes are introduced in the litigation for the first time. That's when we see them, not when it would have made a difference to Mr. Ray's performance when he could have had an opportunity to cure or to deal with it. But the question is not that. The question is whether or not it was a pretext. Right. And I think the fact that they only show up in litigation when there are at least three versions of those notes and C&H cannot authenticate for us when those notes were created on a computer file and there's two different stories that are dramatically different about why we can't authenticate them. One, the computer is stolen, and one, there's a virus or something introduced. But the notes also talk about other employees. That's correct. Okay. So it's not like there's a separate note that is written about Mr. Ray, right, that's created after the fact in order to create this pretext, right, because it involves other employees as well. But as I understand it, C&H's position is that these notes were created by Mr. Landa in order to recognize performance problems for all employees, for all the employees that Mr. Landa was supervising. Yet, although we have this 14- or 15-month record according to Mr. Landa, there is no evidence that those notes were used to discipline any other employees. So I think what that shows is that Mr. Ray is being singled out. It is a pretext. We have no way to determine the authenticity of those notes. We don't know what they say about other employees for certain. What we do know is that we have no way to determine their authenticity and when they were created. For all we know, they could have been created after the fact. Let me ask you another. I went at this a little bit differently. Do you agree that Cronin and Merritt made the decision to terminate? They might have signed off on the dotted line, but I think that decision was made by Mr. Adams. Mr. Adams was the guy. But Mr. Adams couldn't terminate on his own, could he? I'm not sure that that's true. Oh, you're not? No, I'm not sure that that's entirely true. All right. I guess my worry is if I look at Cronin and Merritt, I'm trying to figure out what evidence they have that your client was a good performer. Well, what they have, presumably, is feedback. I mean, I don't see anything in the record that would suggest that they would have evidence he was a good performer. Well, they knew that there were no complaints against Mr. Ray for 14 months before Mr. Adams came on board, until days after Mr. Adams came on board, and that's when the flood, the torrent of information of complaints, starts coming forward. It's like a light switch. So my ultimate question is, even if they were wrong that he was a poor performer, why could they not terminate in that instance? They relied on the supposed fact of his poor performance. Mr. Merritt's communication of the issue. Well, but we went through that. What evidence do they have that he was a good performer? I couldn't find any other than he was still working. They do have evidence he was a poor performer. They have evidence that he got all this information he's a poor performer. Now, they may be wrong about that. He may have been a good performer, but I got no law that says they can't terminate him even if they have bad evidence, if the only evidence they have is that he's a bad performer. They relied, Mr. Merritt relied on the fact he wanted documentation of poor performance before he would agree to a termination. That was the exchange between himself and Mr. Adams. Mr. Adams went to him in an e-mail and said, listen, I want to get rid of him, he's a bad performer, and Mr. Merritt e-mailed back, fine, I'll agree to that if you come up with appropriate documentation. Isn't that what he was supposed to do? Well, that is what he was charged with doing, and that's why we say that this floodgate of pretextual performance problems starts beginning on April 8th. He's coming in. Nobody knows on April 8th except HR. On April 8th, HR knew that Mr. Merritt. Well, they received first his game. That's correct. That's the first time HR knows it. Nobody else knows anything about it that's in this record. And yet everything which nobody, I mean, when I tried to document HR going to certain people to know this and therefore make the decision based on this, I couldn't put the evidence together. That's why I keep asking you about it. Okay. Maybe I'm apologizing. Maybe I'm not following the inquiry well. There was no reason to suspect on the part of management other than Mr. Adams that there was any problem with Mr. Ray's performance up until that point on April 8th. There was none, zero. The one needs improvement performance record I've already addressed, that was it. Mr. Landa's notes came up only in the course of litigation. Ms. Cronin indicated that after speaking with Mr. Adams that there's full documentation of performance problems with Mr. Ray, and that's simply a false statement. There was none. There was no record of any performance problems in the CNH file, and that is a problem with Mr. Landa's claims. The post-April 8th stuff, we addressed many of those in our papers and in our summary judgment opposition, and there's a footnote, I believe it's footnote 2, indicates the CNH claims we didn't address the majority of these supposed performance problems. That's not accurate because we referred to, because of page limitations, we referred to Mr. Ray's declaration where he explains that the vast majority, if not all, of these issues were, there's some response to them that indicates that it's not accurate, it's not what they say. All of those things, we say, raise disputed issues of fact as to his performance, and the fact that they were being, what we say, fabricated is an indication of pretext, and the disassembly by Ms. Cronin and, I believe, by Mr. Adams and even by Mr. Landa himself all support the notion that there was pretext, not to mention the proximity in time. Thank you. I think we have your argument. Thank you very much. Thank you, Your Honor. You've gone over time, but we wanted you to be able to address those issues, which we thought were quite important. I appreciate it, and I hope I answered your court questions. Thank you. Counselor. Good morning, Your Honors. May it please the Court, Matthew Gooden on behalf of defendant below, C&H Sugar and appellees in this Court. I think it would be helpful to, it appears the Court is primarily interested in Mr. Ray's retaliation claim, and in addressing that, I think it would be important to go over a timeline because there's a number of significant events that Mr. Gianetta neglected to mention. Mr. Ray was hired in March of 2007. Mr. Gianetta did acknowledge that in September of 2007, he received a needs improvement performance evaluation, the lowest possible rating. And, yes, the review form does say that that can be an appropriate rating for a new employee, but it doesn't mean he's performing well. It's still the lowest possible rating. The review specifically noted that Mr. Ray had problems in the technical knowledge area, learning the computer systems, exactly the same types of problems that Mr. Landa noted in his declaration. Mr. Adams was then hired on March 4, 2008, and on March 17, 2008, there's the alleged you're old comment. On March 21, Mr. Adams and Mr. Landa met with plaintiffs to discuss his performance. They discussed that they were dissatisfied with his performance. This was not mentioned at all by Mr. Gianetta. This happens on March 21. In fact, Mr. Ray claims that they demoted him in that meeting. They demoted him to an assistant supervisor, changed his job duties. I would submit there's no real evidence to support the claim of an actual demotion, but that is Mr. Ray's claim. He claims he was demoted in that meeting on March 21. He admitted in deposition that he understood from this meeting that both Mr. Landa and Mr. Adams were unsatisfied with his performance, and they were moving him to the day shift for more training. On March 24, three days after this meeting. Just a second. Why is that not evidence of retaliation? Because there's nothing to retaliate against yet. There's nothing that's happened. Mr. Adams isn't aware of any complaint. There hasn't been any complaint made. Mr. Ray doesn't make the complaint to Ms. Cronin until March 28. The only thing that's occurred at this point is the alleged you're old comment, but there's nothing to retaliate against from that because Mr. Adams doesn't even know that anybody's upset about it yet. Nobody's complained about it yet. And, in fact, of course, Mr. Adams denied the comment was made, as did everybody else that was at the meeting. Well, and it's unclear when exactly HR received the complaint, right? Because that wasn't until April. Correct. All of these March dates that you have are prior to what's in the record. They received the complaint on April 8. And it's prior to even the first date that Mr. Ray claims he notified HR about the complaint. He claims that occurred on March 24. Oh, yeah, 24. So the meeting where he admits or he claims he was demoted happened three days before Mr. Ray complained to HR. Now, quite frankly, we could look at that as suspect in itself exactly the way Ms. Cronin did. It's very common, and the cases have noticed and commented on this. We've cited some cases in our briefs where it happens frequently that plaintiffs or that employees are disciplined, they fear their job is in jeopardy, and they go to HR to make a complaint in the hope that that complaint might save their job. That is very quite possibly what happened here. But that's not the claim we're making. I'm going to go back to the timeline. You can't go there because we've got to give every intentment and the fact to the plaintiff. Absolutely understood. And I do understand that. I want to return to the timeline. April 8th is the date that the written complaint is marked received by Ms. Cronin. They claim that the incidents that happened on April 8th have to be retaliatory, that he was placed on a 30-, 60-, 90-day probation, and they were seen, Landa and Adams were seen taking pictures in Mr. Ray's inventory area. That's simply not possible. The only evidence that plaintiff has that Mr. Adams learned of Mr. Ray's complaint comes from the date that Ms. Cronin interviews him. And it does appear from Mr. Adams' statements as recorded in that interview that he believed that Mr. Ray made a complaint about him. We're not arguing that. But that happened on April 12th. There is no dispute about that. So anything that occurred on April 8th, it cannot possibly be, as a matter of law, retaliatory. There is no evidence in the record that Mr. Adams, Mr. Landa, or anyone else knew on April 8th that Mr. Ray had made a complaint. And Mr. Landa states in his declaration that he never knew that Mr. Adams made a complaint. I'm sorry, that Mr. Ray made a complaint. And that is undisputed. That is in his declaration under oath, and there's no evidence to dispute that. A lot of the performance criticism came from Mr. Landa. Some of it came from Mr. Peterson. Some of it came from Mr. Bortolussi, an inventory clerk, who recorded inventory problems in Mr. Ray's workstation. There is no evidence to suggest that any of these people were aware of Mr. Ray's complaint or had any motive to make up or fabricate incidents of harassment. Or, I'm sorry, incidents of performance criticism. Ms. Cronin notes in her investigation report that Mr. Adams and Mr. Landa showed her, at that time, documented examples of Mr. Ray's performance problems. Again, there is no dispute about that fact. They claim, they argued in their brief, that the testimony of Mr. Fairman and Mr. White should be given particular weight because they were gone from C&H at the time they were deposed. They have no dog in the race. Their credibility should be assumed because they don't have any stake in the case. Well, if that's the case, the exact same thing must be true about Ms. Cronin. She, too, had been gone from the company for two years as of the time that her deposition was taken. She has no motive to fabricate evidence in this case, no more so than Mr. Fairman or Ms. White would, the two witnesses that they rely on the most. So, back to the timeline.  The thing that worries me the most about this particular situation is that it seems as if, on April 8th, all of the bad things start to happen. It also seems as if that's the very day that HR says, I got the complaint. So, I got all these bad things happening to him on the same day they get the complaint. My worry is that they start taking pictures, they put him on probation, they do all these kind of things. Why is that not just enough to say that it raises an issue of material fact? I think it's important to look at it in context. And in context, first we have Mr. Adams as a new employee, tasked with making specific improvements in the warehouse. Improvements, a new standard which Mr. White thought was unreasonable and caused him to resign. So, there's no question that Mr. Adams is brought in specifically to enforce new performance criteria. He's a brand new supervisor. He's assessing his work crew. And within a month, he identifies Mr. Ray. Not even a month. He starts on March 4th. And on March 21st, they meet with Mr. Ray to inform him that they're dissatisfied with his performance. He's only been on the job for approximately two weeks at that point. So, they've already identified him as a poor performer. They've already had a discussion with him. They've already moved him to the day shift. That's before there's any complaint. But, Counsel, as Judge Smith pointed out, doesn't that really create a triable issue of fact for a jury to decide, to hear all of this and to decide whether or not this was a pretext or not a pretext? I don't believe so at all, Your Honor, because what we have here is a history of performance problems that predate any possible motive for anyone to retaliate against him. And it's perfectly understandable and logical that a supervisor would start paying increased scrutiny to an employee who they have just met with on March 21st to tell him they're dissatisfied with his performance to the point where they're moving him to another shift and going to give him additional training. Mel, I understand you've got the mark. No, I'm sorry. I was just going to say, but there's really two instances of possible negative conduct, if you will, according to you, according to your timeline. One, on March 21st, he's demoted, right? And, well, actually, that's it, because then on April 8th, he files his complaint. So that's the only real negative conduct that's documented anywhere, right, other than the needs improvement on March 2007, I mean September 2007. Those are the two significant criticisms and documented criticisms of Mr. Ray's performance. But then after April 8th, as Judge Smith pointed out, it seems like there's a cascade of negative things that are being attributed, right? Well, there certainly are a lot of negative things that begin around that time. And we also come up with notes that we didn't ever have before. We don't have any of Landa's stuff. We don't have any of that stuff. It all seems to throw in for your point, but when I just put the facts, and that's why my colleague stole my question, when I just put the facts and I put here's this, here's this, April 8th, lots of things happen. The complaint comes in. He says he submits it on March 28th, but it isn't marked in until April 8th. That looks a little uneasy, and yet everything happens on April 8th. And he just, it goes downhill after that, and that's the reason I asked the tough question. Is there an issue of material fact then, based on that point? I don't believe so, Your Honor, because on April 8th, as of April 8th, there is absolutely no evidence to even suggest that Mr. Adams knew of Mr. Ray's complaint. The only evidence, the only evidence in the record, and the only evidence that they can even point to that shows that Mr. Adams knew of the complaint came from Ms. Cronin's interview of him on April 12th, four days later. There is no evidence to suggest or for this court or any court to opine or speculate that Mr. Adams knew of the complaint at any point before April 12th. And moreover, it is not just Mr. Adams that are documenting these performance issues. In fact, the majority of the performance issues from March, late March, through the end, primarily were documented by Mr. Landa in e-mails and communications. There's no evidence that he was ever aware of the complaint. Excuse me for interrupting, but the thing that sort of mystifies me is that Ray went to the head of human resources and she, did she tell him to file a complaint? Her recollection was that he, and her notes reflect this, that Mr. Ray met with her on March 24th, and she asked him at that point to reduce his concerns to writing, and that he submitted a written document, I believe on March 28th, but for whatever reason it was not stamped received until April 8th. That's the document in the record. Okay, well, I'm just wondering how much of this, what's mystifying me is that some of this material came out, I thought, as a result of the investigation of that complaint. Well, some of what, Your Honor? Some of the reports of his bad performance. Exactly, and that was what I mentioned earlier, is that in Ms. Cronin's written conclusion, or written report of the investigation, she remarks that Mr. Landa and Mr. Adams had provided documented examples of his performance, poor performance, that predated your old comment and predated his complaint. The documents that she's referring to, most likely, are Mr. Landa's notes, the same notes that they're claiming now are a fabrication, and by the way, there was no shifting reasons as to why this wasn't located. The initial belief from Ms. Kilkenny, as stated in her declaration, was that Mr. Landa's computer suffered a virus in 2010. Well, nobody knew at that point, until Mr. Landa's deposition was taken, that his computer was stolen before that, in 2009. So that's why, and there's contemporaneous emails documenting that fact, his claim that his computer was stolen. So there's absolutely no fishy reason or explanation as to why those documents can't be recovered. They existed on his laptop, he testified they were on his laptop, he testified he didn't save them to anything else, so they were lost, unfortunately, when his computer was stolen. But the important point is that Ms. Cronin acknowledges that she saw documented examples of his poor performance, and just like Mr. White and Mr. Fairman, there's no possible motive for Ms. Cronin to come into a deposition two years later after she's no longer working for the company, and make up a case to try to get Mr. Ray, you know, to try to win a case, a company that she's not even employed for. Thank you. Your time is gone, and we appreciate your argument very much. I think we've heard from you, really, unless there's some quick thing you want to tell us. You're not young like that last kid. Thirty seconds or less. Mr. Gooden talks about a lot of these complaints coming from other supervisors, and, you know, the law is pretty clear that when you have increased scrutiny of an employee, that's evidence, I believe, of pretext, and the increased scrutiny only occurs after the April 8th period. There's no evidence that all of these people were solicited or were asked to provide information to management or to Mr. Ray before April 8th. But let me ask you a question. As a practical matter, though, if you're the employer and you know that somebody has levied a complaint against you, isn't the wise thing for an employer to do, if the employer is ever going to survive any kind of a retaliatory claim, is to, in fact, document and to be more proactive as far as documenting bad behavior so that they can somewhere along the line come in and say, no, I know that you're arguing that it's retaliation, but it's not, and here's the reason why not. No question about that, Your Honor. If what we're talking about are legitimate complaints about performance, if we're trying to target an employee that we don't like and there's evidence, there's ample evidence to show that Mr. Adams did not like Mr. Ray, he had good reason, if you have a nefarious mind, to want to get rid of him, and to then solicit help from his subordinates to do just that, and Mr. Ray has addressed the majority, if not all, there was page limits in our brief, time limits, and the fact that many of Mr. Landa's complaints were by that time years old. How is it that it's an incredible burden on Mr. Ray to have to come forward years after the fact and contest all of these charges that he never saw until the litigation? Thank you. Thank you, Your Honor. Case 1217813, Ray v. C&H is submitted.
judges: Benitez, Schroeder, Smith